UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| IDELLA RUTHERFORD, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 09-51-GFVT |
| | ) | |
| v. | ) | |
| | ) | |
| BRITTHAVEN, INC., | ) | **MEMORANDUM OPINION** |
| Defendant. | ) | **& ORDER** |
| | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

This matter is before the Court on the Motion for Summary Judgment by the defendant, Britthaven, Inc. [R. 24.] The parties have fully briefed the issue as the plaintiff has filed a response [R. 26] and the defendant a reply [R. 27]. Because the plaintiff has failed to show there is a genuine issue whether Britthaven's reason for firing her was pretextual, the defendant's Motion for Summary Judgment will be granted.

**I.**

Britthaven, Inc. hired the plaintiff, Idella Rutherford, to work as a licensed practical nurse ("LPN") at its nursing home in Bell County, Kentucky in May of 1981. [Rutherford depo., R. 24-4 at 3.][1] As part of her responsibilities as an LPN, Rutherford supervised the nursing home's certified nurses aides ("CNAs") and other subordinate staff. [Defendant's Memorandum, R. 24-1.] In turn, the plaintiff reported to the director of nursing, Vivian Lambert, and Britthaven's

---

[1] All citations to the record refer to documents filed via CM/ECF and page numbers reflect CM/ECF page designation.

administrator, Kelly Goodin. [Defendant's Answers to Interrogatories, R. 27-1 at 12.]

Although Rutherford kept this position for 26 years, her employment record was not unblemished by disciplinary problems. In August of 1987, she received a first warning for chronic tardiness after her eleventh late appearance to work. [R. 24-5.] In January of 1988, she was warned about inefficient work and failing to follow her supervisor's instructions. [R. 24-6.] Rutherford apparently received no further disciplinary warnings until December of 2001 when she was written up for defective work. [R. 24-7.] She received a written warning in January of 2006 for failing to follow up on reported medical errors with a doctor [R.24-8] and a final warning in August the same year for chronic lateness. [R. 24-9.] Although this last warning advised her that she would be terminated if she arrived late to work two more times [*id*.], no subsequent tardiness is documented in the record.

In November of 2006, Britthaven apparently revised its policy on resident abuse and neglect. [*See* Abuse, Neglect or Misappropriation of Resident Property Policy, R. 24-13.] The policy required employees who witness or suspect the abuse or neglect of residents, or misappropriation of their property, to immediately report the alleged incident to their supervisor. [*Id*.] In turn, supervisors who received reports of such mistreatment were obligated to immediately inform the nursing home's administrator, who would investigate the allegations. [*Id*.] On November 17, Rutherford acknowledged being informed of the policy. [Resident Abuse/Neglect Policy, R. 24-10.] According to the notification she signed, "[a]ny employee who fails to immediately report suspected abuse or neglect of a resident will face disciplinary action up to and including termination of employment." [*Id*.] Neither the policy nor the notification she signed defined the terms "abuse" or "neglect."

On October 24, 2007, Rutherford received another final warning, this time for dishonesty, defective work, carelessness, and other general conduct. [R. 24-11.] This latest final warning was issued after a resident's family complained that Rutherford was rude to the resident, unresponsive to her medical complaints, inappropriately discussed her medical history to a non-treating doctor, and feared that Rutherford would retaliate against them. [*Id*.] Rutherford denied these allegations but was advised that subsequent failure to treat residents and their family with respect or take their health complaints seriously, inappropriate disclosure of health information or retaliation against the resident would be met with immediate termination of employment. [*Id*.] Because of this final warning, Rutherford asked to be reassigned to a different wing of the nursing home to avoid future incidents with the complaining family. [Rutherford depo. at 5-6.] Her request was eventually granted. [*Id*. at 6.]

This background prefaces two occurrences on January 16, 2008, while Rutherford was on duty as the charge nurse, which ultimately led to her termination. Both incidents involved allegations of misconduct by Ashley,[2] a 19 year-old CNA under Rutherford's supervision, and were observed by Becky Taylor, another aide under Rutherford's supervision. [Investigation Report, R. 24-12 at 2.]

The first incident occurred at approximately 8:30 in the morning while Ashley was collecting breakfast trays from the residents' rooms. [*Id*.] Taylor overheard a resident ask Ashley to feed her. [Taylor Statement, R. 24-12 at 14.] According to Taylor, Ashley responded in a "hateful" tone that she could not feed the resident until she finished collecting the trays. [*Id*.]

---

[2] Since the parties have redacted Ashley's last name in their briefs, the Court will also refer to her only by her first name.

When the resident persisted in her request to be fed while her food was hot, Ashley suggested that she visit the dining room for her meal. [*Id*. at 15.] The episode concluded when the resident said that she'd feed herself and then report Ashley to Goodin. [Investigation Report at 3.]

At approximately 10:45 that morning, Taylor and Melinda Bracey, a nurse's aide, witnessed the second incident, which involved Ashley and another resident. [*Id*. at 2.] This time, when the resident asked for some ice water, Ashley responded that she brought some earlier in the morning. [Taylor Statement, R. 24-12 at 10.] According to Taylor, when the resident disputed this statement, Ashley screamed at the resident not to call her a liar, accused him of lying, and threatened not to bring him ice water the next day.[3] [*Id*. at 11.]

Taylor did not report these incidents immediately to Rutherford. [Investigation Report at 2.] Instead, she debated whether Ashley's behavior was abusive such that she was required to report it to her superiors. [*Id*.] At approximately 1 p.m., she concluded that she needed to apprise the plaintiff of Ashley's conduct. [Taylor Statement at 1.] Connie Hatfield, an LPN being trained by Rutherford, was also present for Taylor's report. [Investigation Report at 1, 5.] There are conflicting accounts in the record as to precisely what Taylor told Rutherford.

According to the plaintiff, Taylor told her that Ashley had a "bad attitude" with residents. [Rutherford depo. at 7.] When asked to explain what she meant, Taylor said she heard Ashley tell a resident that she could not feed her until she collected all the breakfast trays. [*Id*. at 7-8.] The plaintiff pressed Taylor for more details but was told no more than Ashley displayed attitude

---

[3]According to Bracey, she and Ashley had made several ice deliveries to the resident in question that morning. Nevertheless, the resident yelled and cursed at them for more ice and complained that he never got any water. This prompted Ashley to respond that he was lying because she had brought him ice water earlier. [Bracey Statement, R. 24-12 at 22-23.] It appears that Bracey never reported this incident to a supervisor.

with residents, and the morning's episode was not the first such occasion. [*Id*. at 8.] Rutherford denied being informed about the ice water incident. [Investigative Report at 4.]

Other witnesses indicated that Taylor told Rutherford more than Ashley merely had a bad attitude. Taylor, for instance, stated that she reported both January 16 incidents to Rutherford. [Taylor statement, R. 24-12 at 9.] Moreover, she claims to have informed the plaintiff that Ashley screamed at a resident and talking to him "like a dog." [*Id*.] Hatfiled, the LPN shadowing Rutherford, recalled hearing Taylor report mean, hateful or rude treatment by Ashley towards a resident. [Investigative Report at 5.]

Despite Taylor's report, Rutherford decided against relaying it to the director of nursing or the administrator. [Rutherford depo. at 14, 17-18.] Instead, she decided to monitor Ashley's behavior to see if she could observe any inappropriate behavior first-hand. [*Id*.] As it turns out, later that same day, Ashley approached the plaintiff to advise her of the first incident with the resident. [*Id*. at 9.] According to Rutherford, Ashley confirmed that she had told the resident that she could not feed her until she collected the breakfast trays. [*Id*. at 10.] Ashley, however, stated that she eventually offered to feed the resident, but the resident refused her assistance and threatened to report Ashley to the administrator. [*Id*. at 11.] As a result of her discussion with Ashley, Rutherford believed that the matter had been adequately addressed and again chose not to inform the facility's administrator. [*Id*. at 12-13.]

The next day, January 17, Taylor approached Regina Miracle, the QI director, and advised her of the previous day's incidents. [Investigative Report, R. 24-12 at 1.] In turn, Miracle relayed the report to other nursing home staff, including Goodin [*id*.], and they opened an investigation into the "allegations of verbal abuse" by Ashley. [*Id*.; Defendant's Answers to Interrogatories, R.

27-1 at 4.] During the course of the investigation, Miracle interviewed and took statements from Taylor, Ashley, Bracey, the plaintiff, and Hatfield. [*See id.*] Based on the information obtained during the investigation, the administration concluded that Ashley's conduct was not abusive but "definitely inappropriate." [*Id*. at 6.] Consequently, on January 18, 2008, Ashley was fired for "speaking to residents in an inappropriate fashion." [*Id*.] Rutherford's employment was terminated on the same day for "not reporting possible abuse and not beginning an investigation into the report." [*Id*.] She was 55 years old at the time. [Plaintiff's Memorandum of Law, R. 26-2 at 2.] Of the other employees involved, only Taylor was disciplined, receiving a written reprimand for failing "to report alleged abuse in a timely manner." [Investigation Report, R.24-12 at 6.] According to the investigation notes, she was not fired because she followed up on her initial report with Britthaven's management. [*Id*.]

On January 16, 2009, Rutherford filed the instant action against Britthaven. [Plaintiff's Complaint, R. 1-2.] Her complaint states one claim, namely that Britthaven terminated her employment on account of her age in violation of Kentucky Revised Statute § 344.040, the Kentucky Civil Rights Act ("KCRA"). [*Id*.] Britthaven now asks the Court to enter summary judgment on this claim.

## II.

### A.

Summary judgment is appropriate where "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2); *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986). "A genuine issue of material fact exists when there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for the party.'" *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party has the initial burden of demonstrating the basis for its motion and identify those parts of the record that establish the absence of a genuine issue of material fact. *Hall Holding,* 285 F.3d at 424. Moreover, the movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate there is a genuine issue. *Holding Hall*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). Moreover, "the nonmoving party must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Holding Hall*, 285 F.3d at 424 (internal citations omitted). Finally, the trial court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact" and "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). In applying the summary judgment standard, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Liberty Lobby*, 477 U.S. at 255.

**B.**

The plaintiff brought the instant age discrimination action pursuant to Kentucky Revised Statute § 344.040, the Kentucky Civil Rights Act ("KCRA"), which, among other things, prohibits employers from refusing to hire, discharging, or discriminating against any individual who is 40 years or older with respect to compensation, terms, conditions, or privileges of employment because of that person's age. KY. REV. STAT. ANN. § 344.040(1). The Supreme Court of Kentucky has held that the provisions in the KCRA are consistent with the federal Age Discrimination in Employment Act, 29 U.S.C. § 623, *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 495 (Ky. 2005), and are therefore analyzed in the same manner a federal age discrimination claims. *Id.*; *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 393 (6th Cir. 2008) (citing *Harker v. Fed. Land Bank of Louisville*, 679 S.W.2d 226, 229 (Ky. 1984) (explaining that because "[t]he Kentucky age discrimination statute is specifically modeled after the Federal law . . . in this particular area we must consider the way the Federal act has been interpreted," and applying federal case law to the plaintiff's KCRA claim)).

A plaintiff may prove an age discrimination violation either by direct or circumstantial evidence. *Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009). "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003)). Circumstantial evidence is "proof that does not on its face establish discriminatory animus, but does allow a fact finder to draw a reasonable inference that discrimination occurred." *Id.*

In this case, the plaintiff has produced no direct evidence of discrimination, so she bears

the burden of making a circumstantial case under the three-step framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973); *Geiger v. Tower Automotive*, 579 F.3d 614, 622 (6th Cir. 2009). Under the *McDonnell Douglas* burden shifting approach, the plaintiff must first establish a prima facie case of discrimination by showing that she is (1) a member of the protected class of persons (i.e., persons 40 years of age or older); (2) was discharged; (3) was qualified for the position she held; and (4) was replaced by someone outside the protected class. *Allen*, 545 F. 3d at 394. In the age discrimination context, the fourth element has been modified to require a showing that the plaintiff was replaced by someone substantially younger than the plaintiff. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312-13, 116 S.Ct. 1307 (1996); *Bush v. Dictaphone Corp.*, 161 F.3d 363, 368 (6th Cir. 1998), *Williams*, 184 S.W.3d at 496. "Once a plaintiff satisfies his or her prima facie burden, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Allen*, 545 F.3d at 394 (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998). "If the employer meets this burden, the burden of production shifts back to the plaintiff to show that the employers nondiscriminatory explanation is a mere pretext for intentional age discrimination." *Id.*

Rutherford has made a prima facie case of discrimination. There is no dispute among the parties that the first three elements have been satisfied. At the time Rutherford was discharged, she was 55 years of age, and therefore a member of the protected class. Moreover, Britthaven concedes that, Rutherford's discharge notwithstanding, she was qualified for the position she held, thereby satisfying the second and third elements.

Britthaven contests the fourth element on the ground that there was no "replacement"

because an existing employee, Debra Bradshaw, absorbed Rutherford's duties in addition to maintaining her existing duties. [Britthaven's Answer to Interrogatory No. 15, R. 27-1 at 11-12.] Britthaven relies on *Grosjean v. First Energy Corp.*, 349 F.3d 332 (6th Cir. 2003), wherein the Sixth Circuit held that a plaintiff is not "replaced" under the fourth element "when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Id.* at 336 (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)). *Grosjean* and *Barnes*, however, are not dispositive of this issue. In *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 1997 Fed.App. 0302P (6th Cir. 1997), the Sixth Circuit held that promoting a younger, part-time employee to full-time status to assume the discharged employee's responsibilities was tantamount to a replacement. *Id.* at 522. "This type of reassignment is analogous to hiring a new employee to cover the terminated employee's duties. [The part-time employee] did not assume [the discharged employee's] duties in addition to his own part-time duties. Rather, [the employer] had to fundamentally change the nature of [the part-time employee's] employment, *by promoting him to full-time status*, in order to have him assume [the discharged employee's] duties in addition to his own." *Id.* (emphasis added); *see also Godfredson v. Hess & Clark,* 173 F.3d 365, 372-373, 1999 Fed.App. 0130P (stating that *Tinker* is an application of the analysis set forth in *Barnes* and therefore both cases must be considered in determining whether a discharged employee was replaced.)[4] Although Britthaven scrupulously recites the fact that Debra

---

[4]In discussing *Tinker*, the *Godfredson* court misstated that case's factual background and holding. First, in *Godfredson* the court stated that Tinker was discharged as part of a reduction in force. *See Godfredson*, 173 F.3d at 372. As *Tinker* stood before the court of appeals, however,

-10-

Bradshaw "absorbed" the plaintiff's duties, it also stated that in order to do so, she was moved from a part-time to full-time status. [R. 27-1 at 11.] The defendant's own statements therefore establish that Bradshaw's position had to be fundamentally changed to assume the extra responsibility. Consequently, Bradshaw's elevation to full-time status constitutes a replacement under *Tinker*.

There is also no doubt that Bradshaw, who was 45 years old at the time, was substantially younger than Rutherford when she replaced her. Britthaven initially argued that the fourth element is not satisfied because Bradshaw was not outside the protected class of employees. [Defendant's Memorandum, R. 24-1 at 10-11.] As indicated above, this misstates the standard as modified by *O'Connor*. All that is required is that a substantially younger employee replace the plaintiff. *O'Connor*, 517 U.S. at 313, 116 S.Ct. at 1310; *Grosjean v. First Energy Corp.*, 349 F.3d 335 (6th Cir. 2003). Under the precedents of this circuit, the ten-year age difference between Rutherford and Bradshaw is substantial. *See Grosjean*, 349 F.3d at 340 (holding that an age difference of less than six years is not significant but reiterating precedent that eight years can be a significant difference). Accordingly, there is sufficient evidence that Rutherford was replaced

---

the reason for the plaintiff's discharge was still disputed by the parties, but there was no indication that it was the result of a reduction in force. Instead, the employer claimed, as its nondiscriminatory explanation for discharging the plaintiff, that Tinker, an automotive repair mechanic, violated company policy by performing work without a proper work order. *See Tinker*, 127 F.3d at 521, 523.

Second, *Godfredson* can be read to imply that in order for a promotion of a part-time employee to constitute replacement, there must also be an independent "fundamental change" in the replacement's position. *See Godfredson*, 173 F.3d at 372-373. *Tinker* did not so hold. Instead, as quoted above, the *Tinker* court found that the "fundamental change" to the replacement's position was its change from part-time to full-time status, which permitted the replacement to assume Tinker's duties. *Tinker*, 127 F.3d at 522.

by a younger individual to satisfy the fourth element of her prima facie case.

Since Rutherford has made a prima facie case of discrimination, the burden shifts to Britthaven to "articulate a legitimate nondiscriminatory reason for the adverse employment action." *Allen*, 545 F.3d at 394 (citing *Ercegovich*, 154 F.3d at 350)). The defendant's burden in this regard is one only of production because "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1082, 1994 Fed.App. 0255P (6th Cir. 1994) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)). Britthaven has met its burden of production. It has introduced evidence that it discharged the plaintiff because she failed to report possible verbal abuse of a patient to her supervisors, as required under the corporation's abuse and neglect policy.[5] Therefore, the burden shifts back to Rutherford to show that Britthaven's proffered reason was a pretext for intentional age discrimination. *Allen*, 545 F.3d at 394; *see also* Manzer, 29 F.3d at 1083 ("[T]he only effect of the employer's nondiscriminatory explanation is to convert the inference of discrimination [from the prima facie case] from a mandatory one which the jury *must* draw, to a permissive one the jury *may* draw, *provided* that the jury finds the employer's explanation "unworthy" of belief.")

---

[5] The plaintiff argues that Britthaven failed to articulate a legitimate, nondiscriminatory explanation because, after investigating the matter, it concluded that no abuse occurred. Consequently, and because Rutherford claims to have been informed only of Ashley's bad attitude, she argues that there was no abuse or potential abuse for her to report. This argument fails because the defendant has produced sufficient evidence for the trier of fact to conclude that Rutherford was fired for failing to report suspected abuse to management. Moreover, Rutherford's argument essentially is that there is no basis in fact for Britthaven's explanation, which is more properly addressed at the pretext stage of the inquiry. *See Allen*, 545 F.3d at 395-396.

Pretext may be shown "either directly by persuading [the trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Manzer*, 29 F.3d at 1081 (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. At 1095)). "Once the employer has come forward with a nondiscriminatory reason for firing the plaintiff, . . . the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Id.* at 1083. More particularly, "[t]o make a submissible case on the credibility of the employer's explanation, the plaintiff is required to show by a preponderance of the evidence either (1) the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [the plaintiff's] discharge, or (3) that they were *insufficient* to motivate discharged." *Id.* at 1084. Since Rutherford concedes that the second kind of pretext is inapplicable,[6] the Court will concentrate on her arguments concerning the factual basis and sufficiency of Britthaven's nondiscriminatory explanation.

Pretext that arises from a lack of basis in fact "consists of evidence that the proffered basis for the plaintiff's discharge never happened, i.e., that they are 'factually false.'" *Id.* at 1084. Like the third kind of pretext, it is a direct attack "on the credibility of the employer's proffered motivation for firing plaintiff, and, if shown, provide evidentiary basis for . . . the fact finder to

---

[6] To make a case that the given explanation did not actually motivate the plaintiff's discharge, "the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal. The plaintiff's attack on the credibility of the of the proffered explanation is [] an indirect one. In such cases, the plaintiff attempts to indict the credibility of [her] employer's explanation by showing that circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employee's explanation is a pretext, or coverup." *Manzer*, 29 F.3d at 1083-04 (citations, footnote, and internal quotations omitted).

infer illegal discrimination from the plaintiff's prima facie case." *Id*.

In arguing that Britthaven's explanation was factually false, Rutherford emphasizes the fact Britthaven ultimately concluded that no abuse occurred. This argument misconstrues the nature of the factually false variety of pretext. The test is not whether an actual violation of company policy occurred but whether Britthaven honestly believed that one had occurred. *Allen*, 545 F.3d at 398 ("in determining if the plaintiffs have raised a genuine issue of material fact as to pretext, we should consider not whether [the plaintiffs] *actually* breached patient confidentiality, but rather whether [the defendant] had an honestly held belief that they had committed a Group I offense."); *see also Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) ("as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is shown to be incorrect.") The fact that Britthaven ultimately concluded that Ashley had not been abusive is therefore irrelevant.

To determine whether an employer could have an honest belief in its nondiscriminatory explanation, courts in this circuit look to the process used by the employer to arrive at its decision to fire the employee. As the Sixth Circuit has instructed:

> the key inquiry in assessing whether an employer holds such an honest belief is whether the employer made a reasonably informed and considered decision before taking the complained-of action. An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied 'on the particularized facts that were before it at the time the decision was made. [W]e do not require that the decisional process used by the employer be optimal or that it left no stone unturned.

*Allen*, 545 F.3d at 398 (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007).

In considering whether Britthaven held an honest belief, the Court considers the facts in a light most favorable to plaintiff, including that Rutherford knew nothing more than Ashley had been "rude" or exhibited a "bad attitude" towards a resident during her breakfast rounds. Even so, Britthaven's decision to terminate the plaintiff was reasonably informed. Britthaven's management learned of Ashley's conduct the day after it occurred, and Miracle and Goodin promptly conducted an investigation. They interviewed all Britthaven employees with knowledge of the events, including the plaintiff. Although they determined that Ashley had not acted abusively towards the residents in question, they nonetheless concluded that she acted inappropriately. Notwithstanding the absence of actual abuse, they also concluded that the allegations of rudeness or attitude by nursing home staff were serious enough to warrant an investigation for potential abuse and that a supervisor who learns of such allegations should relay them up the chain in accordance with its abuse policy. In light of a nursing home's obvious interest in and responsibility for ensuring proper treatment of its residents, these conclusions are entirely reasonable, and just because there is ambiguity in the policy does not mean the plaintiff has shown Britthaven's actions were unreasonable or dishonestly undertaken. *See Allen*, 545 F.3d at 399. Finally, the plaintiff has not alleged that the investigation was somehow irregular or idiosyncratic so as to call Britthaven's honest belief into question. *Cf. Jenkins v. Nashville Pub. Radio*, 106 Fed.Appx 991, 95 (6th Cir. 2004) (concluding that plaintiff in discriminatory hiring had raised a genuine issue of material fact as to pretext in part because the plaintiff produced evidence of irregularities in the application and selection process.) Rutherford has therefore failed to identify the existence a genuine issue with regard to its first pretext argument.

As for the sufficiency of Britthaven's nondiscriminatory explanation, Rutherford

challenges it on the grounds that Becky Taylor, Connie Hatfiled and Melinda Bracey, all of whom are significantly younger than the plaintiff, were not terminated. Proving petext due to insufficient reasons "ordinarily [] consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id*. Or, as the Sixth Circuit has elaborated, "[t]o be similarly situated, the individual with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000) (quoting *Ercegovich*, 154 F.3d at 352)). While exact correlation is not required, "the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all other relevant aspects." *Id.* (internal quotation marks omitted).

When the facts are viewed in a light most favorable to Rutherford, it is clear that Taylor, Hatfield and Bracey were not similarly situated to her. First, each of these employees were subordinate to Rutherford to some degree. Taylor and Bracey, as nurse's aides, and Hatfield, a nurse being trained by Rutherford, were directly under the plaintiff's supervision. The Sixth Circuit has repeatedly found that supervisory and non-supervisory employees are not similarly situated. *See Walker v. Ohio Dep't of Rehabilitation & Correction*, 241 Fed.Appx. 261, 267, 2007 WL 2031300 (6th Cir. 2007) (front-line corrections officer and supervisory officer not similarly situated); *Quinn-Hunt v. Bennett Enterprises, Inc.*, 211 Fed.Appx. 452, 459, 2006 WL 3780309 (6th Cir. 2006) (hotel night auditor and manager-on-duty not similarly situated in part

because former is not a supervisory employee); *Campbell v. Hamilton Co., Ohio*, 23 Fed.Appx. 318, 326, 2001 WL 1322785 (6th Cir. 2001) (fact that plaintiff was probation officer and co-employee was supervisor with ten-years experience sufficient to demonstrate dissimilarity); *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994). Additionally, there is no evidence in the record that these employees were tainted by a history of disciplinary problems, including a recent, final reprimand for inappropriate conduct towards a resident. By contrast, Rutherford's employment record and her final warning for rudeness and being unresponsive to a resident's medical needs indicates that her situation was marked by aggravating circumstances that distinguishes Britthaven's treatment of her. *See Campbell v. Hamilton Cty.*, 23 Fed.Appx. 318, 325 (6th Cir. 2001) (differences in disciplinary history may establish that two employees are not similarly situated); *Martin v. U.S. Playing Card Co.*, 172 F.3d 48 at *4 (6th Cir. 1998) (co-employee with fewer disciplinary warnings than plaintiff did not engage in the same conduct as plaintiff and thus was not similarly situated). Because of these differences, the Court does not believe that a reasonable juror could reject Britthaven's nondiscriminatory explanation as insufficient to motivate the plaintiff's discharge.[7]

### III.

To conclude, the plaintiff has failed to demonstrate the existence of a genuine issue with

---

[7] The comparison to Taylor and Hatfield is even more attenuated as their conduct substantially differed from the plaintiff's. Whereas Rutherford failed entirely to apprise her supervisors of Ashley's conduct, Taylor eventually informed the plaintiff and subsequently followed up with management. Hatfield, as a trainee, could reasonably rely on the course of action chosen by her trainer, Rutherford. Such mitigating conduct and circumstances readily explains why Taylor escaped with only a written warning and Hatfield was not disciplined.

regard to the defendant's reasons for firing her.  Consequently, the defendant is entitled to summary judgment.  Accordingly, upon review of the entire record and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. The Motion for Summary Judgment [R. 24] by the defendant, Britthaven, Inc., is **GRANTED**;

2. The Court shall enter a separate judgment in the defendant's favor contemporaneously herewith;

3. The pretrial conference and jury trial in this matter are **SET ASIDE**.

This the 2nd day of June, 2010.

Signed By:
*Gregory F. Van Tatenhove*
United States District Judge